NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent. It is a public record.

# United States Court of Appeals for the Federal Circuit

05-3187

LAUREEN TAYLOR

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

_____

DECIDED: March 17, 2006

_____

Before MICHEL, Chief Judge, MAYER, and LOURIE, Circuit Judges.

MICHEL, Chief Judge.

Laureen Taylor, a Licensed Practical Nurse ("LPN"), appeals a decision of the United States Merit Systems Protection Board ("Board") upholding a decision of the Department of Veterans Affairs removing her from service as a psychiatric nurse at a Veterans Administration Medical Center ("VAMC") hospital because of patient abuse. She was found to have abused a paranoid schizophrenic patient by cutting his hair and attempting to shave his beard while restraining the patient, after the patient had repeatedly objected and resisted. Here, Ms. Taylor is not appealing the finding of patient abuse. Rather, she only appeals the penalty of removal as unreasonable.

Upon removal from the VAMC, Ms. Taylor appealed to the Board. In its initial decision, the Board mitigated her penalty to a fifteen-day suspension, stating that the agency failed to properly weigh the relevant factors as to penalty. Taylor v. Dep't of Veterans Affairs, No. AT-0752-04-0254-I-1 (M.S.P.B. Aug. 11, 2004) ("Taylor I"). The agency then petitioned for review of the initial decision. The petition was granted. In its final decision, the Board overturned the initial decision and sustained the removal penalty of the agency, reasoning that the agency had properly weighed the relevant factors. Taylor v. Dep't Veterans Affairs, 98 M.S.P.R. 337 (2005) ("Taylor II"). Because we agree with the final decision of the Board that the agency properly weighed the relevant factors and that the penalty was not unreasonable, we affirm.

I.

Laureen Taylor worked as a psychiatric nurse at the VAMC in Biloxi, Mississippi. She had worked for the Veterans Administration for seventeen years and had no prior record of discipline. On the evening of September 23, 2003, Ms. Taylor was making her rounds dispensing medication to patients. Ms. Trentcosta, a nursing assistant who had been with the VAMC for approximately one and a half months, was making her rounds offering haircuts and shaves to patients who requested them.[1] At some point while Ms. Taylor and Ms. Trentcosta were making their respective rounds, Ms. Taylor told the patient in question, Mr. S,[2] that he needed a haircut and that she was going to cut his

---

[1]    A barber shop was located on the premises of the medical center. Patients were able to obtain haircuts and shaves from the barber shop for a fee. It is undisputed that the psychiatric patient in question, Mr. S, could afford a haircut and shave from the barber shop, such that lack of financial means was not the reason he had not obtained a haircut and shave from the barber shop.

[2]    To protect the confidentiality of the patient, his name is being abbreviated.

hair, according to her testimony before the VAMC investigative panel.[3] Ms. Taylor testified before the agency investigative panel that he responded that he did not want a haircut.[4] Ms. Taylor admitted to the agency panel that she nonetheless proceeded to cut his hair.[5] Upon completion of the haircut, Ms. Taylor began to shave Mr. S' beard. At this point, he verbally objected and physically resisted by "rolling off," according to Ms. Taylor's agency panel testimony.[6] Ms. Trentcosta then held the wheel of his wheelchair to prevent him from leaving, as Ms. Taylor testified. Ms. Taylor related to the agency panel that she then said to Ms. Trentcosta, "Lisa, don't hurt yourself because you know you are pregnant. . . . [G]o get Bruce [Kinnemore]." Ms. Trentcosta did so. When Ms. Trentcosta returned with Mr. Kinnemore, another nursing assistant, Mr. S again stated that he did not want his beard shaved, as Ms. Taylor testified before the agency panel. At that point, Mr. Kinnemore and Ms. Trentcosta "[held] his hand and his wheel to keep [him] from leaving out," according to Ms. Taylor's testimony to the

---

[3] There is some dispute as to whether it was Ms. Trentcosta's idea or Ms. Taylor's idea to cut Mr. S' hair. Regardless, Ms. Taylor admitted to the agency panel that she was the one who actually cut his hair and attempted to shave his beard.

[4] The number of times that Mr. S said that he did not want a haircut is disputed. Ms. Taylor asserts that Mr. S said that he did not want a haircut only once, immediately prior to her giving him a haircut. Yet Mr. S stated that he said that he did not want a haircut twice prior to Ms. Taylor's beginning the haircut and that he "struggled." Nonetheless, Ms. Taylor does admit that, after she told him that she was going to cut his hair and prior to her beginning the haircut, Mr. S did state that he did not want a haircut.

[5] Ms. Taylor testified that, during the haircut, Mr. S did not again protest. Mr. S testified that he did further protest during the haircut.

[6] "Rolling off" appears to mean "roll his [wheel]chair to move out – to leave."

agency panel. Immediately thereafter, Mr. S again physically resisted.[7] In the words of Ms. Taylor, "that's when he really started to fussing and cussing." According to Mr. Kinnemore's testimony to the investigative panel, at this point Mr. Kinnemore "put [his] hands on [Mr. S'] wrists" and "held [Mr. S'] wrists." Then Mr. S "started kicking and then started saying no, no, no, and then we stopped," according to Mr. Kinnemore's testimony before the agency panel. Ms. Taylor then ceased attempting to shave Mr. S' beard.

On September 25, two days later, Mr. S complained about this incident to his social worker, Alma Jimerson. Ms. Jimerson then made a formal Report of Complaint.

An internal investigation by the Administrative Board of Investigation ensued, led by Darlene Bellais, RN, the Compliance Officer and Chairperson of the Board of Investigation. Before the investigative panel, Ms. Taylor was asked, "Laureen, if you could do anything differently, what would it have been that night?" She responded that she "didn't think nothing of it" and that she "cared enough to help him on numerous occasions to help him clean up."[8] When asked whether she would like to make a final statement, she replied that she was "sadly hurting that [she] was accused of patient abuse" and that she "tried to do the best [she] can to help a person, a patient . . . ."

---

[7]    Mr. S testified before the agency panel that he did not want to physically resist too much or too strenuously because of Ms. Trentcosta's presence and her pregnant state. Ms. Trentcosta was eight months pregnant at the time of the incident. Mr. S stated that "she's pregnant and I didn't want to wrestle too much with the woman."

[8]    Ms. Taylor testified before the agency panel that on a prior occasion, she had "cut [Mr. S'] hair" and "clean[ed] him up" prior to one of his doctor's appointments. That testimony notwithstanding, another nurse, Karen Gillette, Associate Nurse Executive for Extended Care, testified that it was "common knowledge" that Mr. S did not like to have his hair cut.

The panel then proposed removal as the appropriate penalty, based upon a table of penalty range from reprimand to removal. In a report entitled "Douglas Factors," the Deciding Official, Julie Catellier, LPN, Director of the Center, assessed the Douglas factors to determine whether the proposed penalty of removal would be reasonable. Two factors in particular had emerged as the most significant to the panel and in the Douglas Factors report: the nature and seriousness of the offense and the restraint of Mr. S even after his repeated objection. Based upon this weighing of the Douglas factors, she found the penalty of removal appropriate. The agency thus removed Ms. Taylor from her position by a separate decision letter, also signed by Ms. Catellier.

II.

This Court must affirm a Board decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law; or unsupported by substantial evidence. 5 U.S.C. § 7703(c). In determining the appropriateness of a penalty, an agency must weigh the factors outlined in Douglas v. Veterans Admin., 5 M.S.P.R. 280 (1981). When, as here, the Board sustains the agency's charge, the agency's decision may only be reviewed to determine whether the agency properly weighed the relevant Douglas factors and whether the penalty was reasonable based on its weighing of factors. Cantu v. Dep't of the Treasury, 88 M.S.P.R. 253 (2001).

The first Douglas factor is the "nature and seriousness of the offense." 5 M.S.P.R. at 305. In her Douglas Factors report, Ms. Catellier stated that the "alleged offense is very serious. Ms. Taylor's assaultive behavior toward the patient[ ] created an atmosphere the patient perceived as hostile. Ms. Taylor's inappropriate behavior

caused undue stress to a patient who relied on her for compassion and professional service." The record does not support a finding that Ms. Catellier erred in determining that this offense was "very serious." Indeed, the restraint of Mr. S, especially after he had repeatedly objected and resisted, strongly supports a finding that the offense was "very serious." Thus, the nature and seriousness of the offense weighs in favor of a strong penalty.

Another Douglas factor of particular relevance is the "consistency of the penalty with any applicable agency table of penalties." 5 M.S.P.R. at 305. For a first offense of patient abuse, the table of penalties provides for a penalty ranging from reprimand to removal. Moreover, Memorandum No. 00-55-00, titled "Protection of Patients from Abuse," emphasizes that "**[t]he Department of Veterans Affairs has no tolerance for mistreatment or abuse of patients by its employees**" (emphasis in original).[9] Indeed, this Memorandum informs employees that "[i]f patient abuse is proven, appropriate disciplinary action will be taken, including possible dismissal from employment."[10] Ms. Taylor disputes the statement by Ms. Catellier in Ms. Catellier's assessment of the Douglas factors that Ms. Taylor "fails to acknowledge any wrongdoing." Ms. Taylor argues that consideration of this allegedly erroneous fact in the weighing of the Douglas factors unfairly skewed the Douglas analysis. Yet whether or not Ms. Taylor's statements to the panel showed such a failure, the other factors alone, in particular the seriousness of the offense, supported removal as an appropriate

---

[9] The Definitions section of this Memorandum states: "Patient abuse includes mental, physical, sexual, and verbal abuse, such as the following: (a) any action or behavior that conflicts with patient's rights, identified in VA regulations 38 CFR § 17.34a; . . . (c) willful violations of a patient's privacy; . . . (e) willful physical injury."

[10] Ms. Taylor admitted that she is aware of this Memorandum.

penalty, especially given the zero tolerance policy for patient abuse and the notice to employees of the definition of patient abuse and the possible penalty of removal. Thus, the penalty of removal of Ms. Taylor for patient abuse was consistent with the possible range of penalties for the offense, given the facts of this case.

III.

Because we agree with final decision of the Board that the <u>Douglas</u> factors were properly weighed, in particular the nature and seriousness of the offense of patient abuse, we <u>affirm</u>.